UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| DEBIN XIA,<br><br>Plaintiff,<br><br>v.<br><br>UNITED MACHINING, INC. and WESCAST INDUSTRIES, INC.,<br><br>Defendants. | Case No. 24-cv-11759<br><br>Honorable Robert J. White |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

I. Introduction

Debin Xia (Xia) commenced this action against his former employers, United Machining, Inc. and Wescast Industries, Inc. (Defendants). Xia alleges that Defendants terminated him after he raised concerns about their customs and tax practices and stated that he would report those concerns to federal authorities. He brings claims under Michigan's Whistleblowers' Protection Act and for wrongful discharge in violation of Michigan public policy. Defendants counterclaimed, alleging violations of the Defend Trade Secrets Act, the Computer Fraud and Abuse Act, and spoliation of evidence.

Before the Court are Xia's motion for summary judgment, Defendants' cross-motion for summary judgment, and the associated responses and replies. (ECF Nos. 28, 30–34). The Court will decide the motions without a hearing pursuant to E.D. Mich. LR 7.1(f)(2). For the following reasons, (1) Xia's motion for summary judgment is denied as to Count I of the complaint and granted as to Defendants' counterclaims, and (2) Defendants' motion for summary judgment is denied in its entirety.

## II. Background

### A. *Factual history*

Defendants United Machining, Inc. and Wescast Industries, Inc. employed Debin Xia as Director of Finance for their North American operations. (ECF No. 1, PageID.7, ¶ 6). In that role, Xia was responsible for accounting, financial reporting, and related financial matters. (ECF No. 30-1, PageID.948, ¶¶ 3–4, 8). Xia is a certified public accountant. (ECF No. 1, PageID.7, ¶7).

During his employment, Xia became concerned about Defendants' customs and tariff practices relating to products imported from China. Xia believed that Defendants were selling Chinese castings to affiliated North American entities for less than their manufacturing cost. (ECF No. 28-2, PageID.348, Tr. 37:8-39:13). According to Xia, the lower prices reduced the tariffs owed on the castings and allowed Defendants to make it appear that a greater portion of the products' value

came from processing performed in Canada. (*Id.* at PageID.349, Tr. 38:10-20). Xia believed these practices constituted dumping and tax fraud. (*Id.* at PageID.348, Tr. 37:16-38:2). Xia first reported his concerns to senior management in September 2023. (ECF No. 1, PageID.16, ¶ 13). He testified that he raised his concerns because he "did not want to get involved in such fraudulent practices." (ECF No. 28-2, PageID.350, Tr. 39:24-40:2).

On October 17, 2023, Xia expressed his concerns in an email to several members of Defendants' management. (ECF No. 28-4, PageID.453). Xia asked where certain castings originated and stated that, if they were made in China, Wescast should identify China rather than Canada as their country of origin. (*Id.*). He warned that "any willful attempt to evade or defeat taxes is considered a felony" and described the potential criminal penalties for federal tax evasion. (*Id.*).

Xia also attached the IRS Tax Crimes Handbook to the email and provided management with an internal chart that he believed documented the conduct he was reporting. (*Id.* at PageID.454, 460-635). According to Xia, the chart identified products that had already been sold and showed that their sales price was lower than the manufacturing cost of the raw castings imported from China. (ECF No. 28-2, PageID.367, Tr. 56:11-20).

Xia testified that Defendants did not respond to this email. (*Id.* at PageID.391, Tr. 80:14-24). Xia then continued raising the issue orally with management and

provided additional internal materials that he believed documented improper transfer pricing and efforts to reduce Defendants' tariff obligations. (*Id.* at PageID.369, Tr. 58:13–61:17). According to Xia, his treatment at work changed during this period. He was isolated from his team, the CFO stopped responding to his calls and messages, and he was excluded from meetings he previously attended. (ECF No. 28-2, PageID.351, Tr. 40:1-10). Xia further testified that, after he reported the alleged dumping, a human-resources employee told him, "something along the line that [he] was going to be fired." (*Id.* at PageID.365, Tr. 54:8–14).

On October 25, 2023, Xia again emailed management about his concerns. Xia recommended that Defendants seek professional advice and document the matter in case of a customs dispute. (ECF No. 28-8, PageID.658). He warned that responsibility could fall on the company or individual employees "if it involves any tax evasion" and emphasized the need to "keep the highest integrity" when dealing with U.S. and Canadian customs. (*Id.*). Xia testified that Defendants continued to disregard his concerns and that he therefore told management that he "would have to report to CBP or IRS." (ECF No. 28-2, PageID.391, Tr. 80:14-81:1). Defendants offered a different account of their response to Xia's concerns. Weihua Zhu, an account manager for Defendants, testified that he consulted a customs company concerning Xia's concerns and forwarded its response to Xia. (ECF No. 28-14, PageID.807, Tr. 23:1–7).

Defendants terminated Xia on January 25, 2024. (ECF No. 30-1, PageID.948, ¶ 5). The parties dispute the reason for his termination. Xia contends that Defendants terminated him because he raised concerns about their customs and tax practices and stated that he would report those concerns to federal authorities. (ECF No. 28-2, PageID.391, Tr. 80:14-81:1). In an affidavit submitted by Defendants, Yicheng "Chris" Gao, Defendants' Director of Human Resources, states that Xia was terminated as part of a "reorganization and downsizing," but also because he failed to prepare accurate and timely financial reports and his professional and managerial capabilities did not meet the requirements of his position. (ECF No. 30-1, PageID.948–49, ¶¶ 5–7).

At his prior deposition, Gao had limited knowledge of Xia's job performance. Gao testified that he was not Xia's supervisor and had "no idea" whether Xia was a good or bad performer. (ECF No. 28-13, PageID.700, Tr. 18:24-19:24). He also testified that he never disciplined Xia, was never instructed to discipline him, and was unaware of any discipline imposed on Xia by anyone else. (*Id.* at PageID.704, Tr. 22:23-23:11). Gao did testify that before Xia's termination, Xia's direct supervisor told him that Xia's performance had "low efficiency," but could not provide additional details. (ECF No. 28-13, PageID.705, Tr. 25:14-26:11).

Xia's conduct following his termination gave rise to Defendants' counterclaims. Defendants provided Xia with a company-owned, password-

protected laptop to perform his work. (ECF No. 30-1, PageID.949, ¶¶ 9–10). The day after his termination, Xia removed the laptop's internal memory device and replaced it with a new one before returning it to Defendants. (ECF No.28-2, PageID.405, Tr. 94:13-15).

Xia acknowledged that the original device belonged to Defendants. (*Id.* at PageID.403, Tr. 92:12-93:14). He testified that he retained the device because he believed it contained evidence of the conduct he had reported to management and because he had decided to retain an attorney to pursue litigation. (*Id.* at PageID.404, Tr. 93:18-23). Xia subsequently provided the device to his attorney. (*Id.* at PageID.412, Tr. 101:7-17). Xia testified that he did not provide the device or its contents to Defendants' competitors and did not share the information with anyone other than his attorney. (*Id.* at PageID.406, Tr. 95:7-20; PageID.412, Tr. 101:9-17).

In his affidavit, Gao states that Defendants granted Xia access to their email programs, password-protected files, and other confidential company information and documents. (ECF No.30-1, PageID.949, ¶ 10). Gao further states that, after learning Xia had removed the laptop's memory device, Defendants became concerned about "what information was taken from the laptop." (*Id.* at PageID.950, ¶ 19). At his deposition, however, Gao testified that he did not know what information was stored on the device and could not identify any particular document that Defendants needed but no longer possessed. (ECF No. 28-13, PageID.724, Tr.

42:5–8; PageID.752, Tr. 70:3–5). He also testified that he was unaware of evidence that Xia used Defendants' information to compete with them, misappropriated company information, or accessed Defendants' computers, servers, or networks without authorization. (*Id.* at PageID.715, Tr. 33:2–11). Gao further testified that he was unaware of any facts showing that Xia destroyed evidence. (*Id.* at PageID.754, Tr. 72:17–20).

B. *Procedural history*

Xia initially commenced this action in Michigan state court, asserting claims under Michigan's Whistleblowers' Protection Act and for wrongful discharge in violation of Michigan public policy. (ECF No. 1, PageID.7–20). Defendants asserted counterclaims under the Defend Trade Secrets Act and Computer Fraud and Abuse Act, as well as a claim for spoliation of evidence. (ECF No. 1, PageID. 26-29). Then, Defendants timely removed the action to the Eastern District of Michigan. (ECF No. 1, PageID.3).

The parties now cross-move for summary judgment. Xia seeks summary judgment on his Whistleblowers' Protection Act claim and each of Defendants' counterclaims. (ECF No. 28). Defendants seek summary judgment on Xia's claims and their Defend Trade Secrets Act and Computer Fraud and Abuse Act counterclaims. (ECF No. 31).

## III. Legal Standard

A moving party is entitled to summary judgment where the "materials in the record" do not establish the presence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c). All the evidence, along with all reasonable inferences, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When considering cross-motions for summary judgment, "summary judgment in favor of either party is not proper if disputes remain as to material facts" and "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

## IV. Analysis

### A. *Evidentiary Issues*

Before addressing the parties' claims and counterclaims, the Court considers Xia's objections to "Chris" Gao's affidavit and Defendants' computer-forensic expert evidence.

#### 1. Gao Affidavit

Xia argues that the Court should disregard Gao's affidavit because it contradicts Gao's earlier deposition testimony and therefore constitutes a sham affidavit. (ECF No. 32, PageID.1030). Xia maintains that Gao's affidavit contains

assertions concerning Xia's job performance and Defendants' counterclaims despite Gao's deposition testimony disclaiming knowledge of those matters. (*Id.*). Defendants respond that Gao was deposed only in his individual capacity, rather than as a corporate representative under Federal Rule of Civil Procedure 30(b)(6), and that Gao later obtained additional information concerning the matters addressed in his affidavit. (ECF No. 34, PageID.1079–80).

The sham-affidavit doctrine generally prevents a nonmoving party from creating a genuine issue of material fact to defeat summary judgment through an affidavit that contradicts the affiant's earlier deposition testimony. *Reed v. City of Memphis*, 735 F. App'x 192, 198 (6th Cir. 2018); *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 908 (6th Cir. 2006). But the doctrine "does not fit where the moving party files an allegedly contradictory affidavit with his or her motion for summary judgment." *Reed*, 735 F. App'x at 198. Rather, in that circumstance, the opposing party "receives the benefit of the conflict" under the ordinary summary-judgment standard. *Id.* (quoting *Smith v. Cnty. of Lenawee*, No. 09-10648, 2011 WL 1150799, at *12 (E.D. Mich. Mar. 28, 2011)). Thus, "[s]elf-contradiction by the moving party's witnesses may of course create a genuine issue of material fact precluding summary judgment," but it does not warrant exclusion under the sham-affidavit doctrine. *Id.* (citation omitted).

That rule also applies where the parties file cross-motions for summary judgment and the party submitting the affidavit relies on it both to support its own motion and to oppose the other party's motion. *L.V. Nagle & Assocs., Inc. v. Tubular Steel, Inc.*, No. 2:19-CV-11399, 2022 WL 15994930, at *1–2 (E.D. Mich. Aug. 9, 2022). In *L.V. Nagle*, although the plaintiff relied on an affidavit submitted with its own motion to oppose the defendants' motion, the court held that this "two-for-one use" did not bring the affidavit within the sham-affidavit doctrine. *Id.* at *2.

The same is true here. Defendants originally submitted Gao's affidavit in support of their motion for summary judgment. (ECF No. 27-8, PageID.284–86). Defendants subsequently sought leave to amend that motion solely to address formatting and other procedural matters. (ECF No. 29, PageID.882, 884–85). Shortly after the Court granted leave, Defendants filed both their response to Xia's motion for summary judgment and their amended motion. (ECF Nos. 30, 31). Defendants attached Gao's affidavit to their response and cited that filing in their amended motion rather than reattaching the affidavit. (ECF No. 30-1, PageID.948; ECF No. 31). That procedural sequence does not change the purpose for which Defendants originally submitted Gao's affidavit. *See L.V. Nagle*, 2022 WL 15994930, at *1–2. Therefore, the sham-affidavit doctrine does not provide a basis for disregarding Gao's affidavit.

Accordingly, any inconsistencies between Gao's affidavit and deposition testimony are considered under the ordinary summary-judgment standard. *See Reed*, 735 F. App'x at 198. To the extent these statements conflict, the inconsistency may create a genuine issue of material fact. *Id.*

2. ArcherHall Forensic Evidence

Next, Xia objects to the computer-forensic evidence Defendants submitted through Ian Finch (Finch) and ArcherHall Forensics, LLC (ArcherHall) because Defendants did not timely disclose Finch or ArcherHall as experts. (ECF No. 32, PageID.1028–29). Finch, a Senior Digital Forensic Examiner at ArcherHall, states that ArcherHall analyzed the hard drive from Xia's company-issued laptop and generated reports concerning deleted files, internet history, recycle-bin activity, and connected external devices. (ECF No. 30-4, PageID.962–63, ¶¶ 4-10). Defendants rely on that analysis as evidence of Xia's activities involving the laptop and hard drive. (ECF No. 30, PageID.930).

Federal Rule of Civil Procedure 26(a)(2)(A) requires a party to disclose the identity of any witness it may use to present expert testimony. For a retained expert, the party must also provide the disclosures required by Rule 26(a)(2)(B). *R.J. Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 668 (6th Cir. 2024). A party must timely supplement an incomplete disclosure. Fed. R. Civ. P. 26(e)(1)(A). When a party fails to comply with these requirements, Rule 37(c)(1) bars use of the

witness or information "to supply evidence on a motion, at a hearing, or at a trial" unless the failure was substantially justified or harmless. *R.J. Control*, 100 F.4th at 668. Exclusion is "automatic and mandatory" absent such a showing. *Id.* (quoting *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn., P.C.*, 388 F.3d 976, 983 (6th Cir. 2004)).

Defendants did not comply with Rule 26(a)(2). Their March 3, 2025 expert-witness list identified N1 Discovery, not Finch or ArcherHall, as the expert that would testify concerning the condition of Xia's company-issued computer when returned. (ECF No. 17, PageID.99). Defendants never supplemented that disclosure to identify Finch or ArcherHall. Instead, they furnished Xia with the ArcherHall report on September 18, 2025, eleven days before the deadline for completing expert discovery and challenging experts. (ECF No. 24, PageID.117; ECF No. 34, PageID.1081). Production of the report did not satisfy Defendants' separate obligation to identify the expert under Rule 26(a)(2)(A). *See R.J. Control*, 100 F.4th at 668 (recognizing the separate requirements to identify a retained expert and provide the required expert report).

The question, then, is whether Defendants' nondisclosure was substantially justified or harmless. Courts consider: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance

of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). The nondisclosing party bears the burden of establishing substantial justification or harmlessness. *Roberts ex rel. Johnson v. Galen of Va., Inc.*, 325 F.3d 776, 782 (6th Cir. 2003).

The first two factors, surprise and the ability to cure, favor exclusion. Defendants identified N1 Discovery as their forensic expert and represented that its testimony would concern the "status" of Xia's computer when returned. (ECF No. 17, PageID.99). They later relied on a different expert, Finch, and a broader forensic analysis concerning Xia's alleged deletion, access, and transfer of files. (ECF No. 30-4, PageID.963). Although Xia received the ArcherHall report before expert discovery closed, only eleven days remained to evaluate the analysis, depose Finch, obtain rebuttal testimony, and challenge Finch or his opinions. And the Sixth Circuit has recognized that the inability to depose an expert or obtain responsive expert evidence supports exclusion because it impairs the opposing party's ability to meaningfully test the expert's opinions. *R.J. Control*, 100 F.4th at 669–70; *see also Reese v. Herbert*, 527 F.3d 1253, 1265 (11th Cir. 2008) (affirming exclusion where late disclosure foreclosed the opportunity to depose the expert and obtain an expert in response).

Defendants' failure to disclose Finch and ArcherHall is especially troubling given their repeated opportunities to do so while seeking more time from the Court. On April 11, 2025, the parties jointly moved to extend the discovery and dispositive-motion deadlines by thirty days, and the Court granted that request on April 18. (ECF Nos. 18, 19). Following a July 30, 2025, status conference, the Court agreed to extend the discovery deadline and directed the parties to submit a stipulated amended scheduling order, which it entered on August 14. (ECF Nos. 23, 24). Defendants identified neither Finch nor ArcherHall in the joint motion or the stipulated order. Thus, despite the Court's repeated extensions, nothing in the record reflects that Defendants disclosed their intent to replace their forensic expert.

The third factor, disruption of trial, carries less weight because no imminent trial would be disrupted. But that does not establish harmlessness. In *R.J. Control*, the Sixth Circuit recognized that curing an expert-disclosure violation may require reopening discovery and that a district court is not obligated to do so. 100 F.4th at 669–70. Here, fully curing the nondisclosure after the expert-discovery deadline would likewise compel the reopening of expert discovery and potentially further expert challenges.

The fourth factor, the importance of the evidence, cuts both ways. Defendants rely on ArcherHall's analysis to establish Xia's alleged post-termination deletion, access, and transfer of files on his company laptop. (ECF No. 30, PageID.930). But

"[t]he more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 220 (6th Cir. 2019). So the significance of Finch's opinions also increased the importance of affording Xia a meaningful opportunity to test them through expert discovery.

Finally, regarding the fifth factor, Defendants provide no explanation for failing to identify Finch or ArcherHall. Defendants instead contend that Xia waived his objection because he received the report on September 18, 2025, but did not object until he filed his response to Defendant's motion for summary judgment on November 5, 2025. (ECF No. 34, PageID.1080–81; ECF No.33, PageID.1053-54). Defendants' cited authorities do not establish waiver here. In *DIRECTV, Inc. v. McCool*, the experts were identified more than eight months before the objection, and the objecting party neither claimed prejudice nor deposed them while discovery remained open. 339 F. Supp. 2d 1025, 1029–30 (M.D. Tenn. 2004). Likewise, *White v. Meador* involved experts whose identities had been timely disclosed and deficiencies that the opposing party made no effort to investigate or cure until after discovery closed. 215 F. Supp. 2d 215, 220–22 (D. Me. 2002). Here, Defendants identified a different expert, never identified Finch or ArcherHall as experts, and provided Finch's report only eleven days before expert discovery and expert

challenges were due. Neither case establishes that Xia forfeited his Rule 37(c)(1) objection under those circumstances.

On balance, Defendants have not shown that their failure to disclose Finch and ArcherHall was substantially justified or harmless. Xia received neither timely notice of the expert Defendants intended to use nor a meaningful opportunity to conduct discovery concerning his opinions, and Defendants offer no explanation for their failure to comply with Rule 26(a)(2). Accordingly, the Court will not consider Finch's affidavit or the ArcherHall forensic analysis in resolving the parties' summary-judgment motions. *See R.J. Control*, 100 F.4th at 668–70.

Having addressed these evidentiary questions, the Court now turns to the substance of the parties' cross motions for summary judgment.

B. *Whistleblowers' Protection Act*

The Michigan Whistleblowers' Protection Act (WPA) "protects an employee who has reported, or is about to report, a violation or suspected violation of a law to a public body." *Pace v. Edel-Harrelson*, 499 Mich. 1, 6, 878 N.W.2d 784 (2016). Because the WPA is a remedial statute, courts must liberally construe it to favor the persons the Legislature intended to benefit, specifically, those employees engaged in protected activity. *Chandler v. Dowell Schlumberger Inc.*, 456 Mich. 395, 406 (1998). "To establish a prima facie case under MCL 15.362, a plaintiff must show that (1) the plaintiff was engaged in protected activity as defined by the act, (2) the

plaintiff was discharged or discriminated against, and (3) a causal connection exists between the protected activity and the discharge or adverse employment action." *Pace*, 499 Mich. at 6.

Here, the parties do not dispute that Xia was discharged. (ECF No. 28, PageID.309; ECF No. 30, PageID.940). They dispute, however, whether Xia engaged in protected activity and whether a causal connection exists between any protected activity and his termination. (ECF No. 30, PageID.934-40; ECF No. 31, PageID.1008-13; ECF No. 32, PageID.1032; ECF No.33, 1061-65; ECF No. 34, PageID.1075-79).

1. <u>Protected Activity</u>

"Protected activity" under the WPA includes "(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation." *Chandler,* 456 Mich. at 399. Xia does not contend that he reported Defendants' alleged conduct to a public body before his termination. Instead, he contends that he was "about to report" the alleged conduct. (ECF No. 32, PageID.1028, 1032; ECF No. 33, PageID.1060–65).

The WPA does not define what "about to report" means. *Shallal v. Catholic Soc. Servs. of Wayne Cnty.*, 455 Mich. 604, 611-12 (1997). In *Shallal*, the Michigan Supreme Court explained that the phrase was added to protect employees who

"intended to, but were discharged in retaliation before they could, report violations." *Id*. at 612. The Court therefore looked to the ordinary meaning of "about," which includes "on the verge of." *Id*. But an employee's intent to report, standing alone, is insufficient. *Chandler*, 456 Mich. at 402. Rather, the WPA requires an employee claiming that he was "about to report" a violation to establish that fact by clear and convincing evidence. *Id*. at 400; MCL 15.363(4).

Defendants argue that Xia cannot satisfy this standard for two principal reasons. First, they contend that Xia's complaints concerned only future conduct, rather than a violation that had occurred or was ongoing, thus falling out of the scope of WPA's protection. (ECF No. 31, PageID.1009). Second, they contend that Xia was not "about to report" any alleged violation because he never contacted a public body and took no steps toward doing so beyond expressing an intent to report. (*Id*. at PageID.1011–12; ECF No. 30, PageID.939; ECF No. 34, PageID.1079). Xia responds that his complaints concerned existing and ongoing country-of-origin practices and that, although he did not make an external report before his termination, he repeatedly raised the issue and informed Defendants that he would report the alleged violations to the appropriate public bodies if Defendants failed to take corrective action. (ECF No. 33, PageID.1062–65).

A. *Present or Ongoing Violation*

Defendants' first argument – that Xia's claim concerns only future or anticipated violations of law – mischaracterizes his claim. In *Pace*, the Michigan Supreme Court held that the WPA does not protect reports of "future, planned, or anticipated acts" because the statutory phrase "a violation or a suspected violation" requires conduct that "has actually occurred or is ongoing." 499 Mich. at 7–8. There, the plaintiff reported only a coworker's stated intention to commit a future violation, rather than conduct that had already occurred or was ongoing. *Id.* at 8–10.

Xia's claim is different. He contends that Defendants had already engaged in unlawful conduct when he raised his concerns with management. (ECF No. 33, PageID.1062). Xia testified that he discovered the alleged practice in a product that Defendants had already sold for less than its manufacturing cost. (ECF No. 28-2, PageID.348, Tr. 37:11-39:3). He then reported his concerns to senior management and provided internal materials that he believed documented the conduct. (ECF No. 28-5, PageID.637; ECF No. 28-2, PageID.367, Tr. 56:11–20). Xia further testified that he gave Defendants an opportunity to correct the alleged problems and, when they did not, informed management that he would report the conduct to CBP or the IRS. (ECF No. 28-2, PageID.391, Tr. 80:11–81:1). Thus, Xia's contemplated report concerned conduct that he believed had already occurred and remained uncorrected, not conduct Defendants merely intended to undertake in the future. *Pace*, therefore, does not preclude Xia's claim.

B. *“About to Report” Standard*

Defendants’ second argument, that Xia cannot establish he was “about to report” because he never took steps to make an official report, also fails. The WPA does not require an employee to make or take a concrete step toward making the contemplated report. *Shallal*, 455 Mich. at 615, 620. In *Shallal*, the plaintiff told her supervisor that, unless he corrected his conduct, she would report him “to the department, to the board, anybody, everybody.” *Id.* at 613–14. The Michigan Supreme Court held that this threat, “especially coupled with her other actions,” was sufficient for a reasonable jury to find that she was “about to report.” *Id.* at 621. The fact that she first gave her employer an opportunity to correct the conduct did not undermine her intent to report. *Id.* at 616.

The record here similarly contains both an express statement of intent to report and conduct supporting that intent. After repeatedly raising his concerns with management and providing materials that he believed documented the suspected misconduct, Xia testified that he told management he “would have to report to CBP or IRS” if Defendants did not correct the alleged problems. (ECF No. 28-2, PageID.391, Tr. 80:11–81:1; *see also* ECF No. 28-4, PageID.453; ECF No. 28-5, PageID.637). As in *Shallal*, Xia’s express statement that he would report the conduct, “coupled with [his] other actions,” permits a reasonable jury to find that he was “about to report.” 455 Mich. at 621.

Defendants cite *Pope* and *Campbell* in support of their argument, both of which involved materially different evidence. In *Pope*, the plaintiff relied on a "single, unsubstantiated, uncorroborated statement" of her intent to report, unsupported by other evidence indicating an imminent report. *Pope v. Brinks Home Sec. Co.*, No. 294600, 2011 WL 711133, at *7–8 (Mich. Ct. App. Mar. 1, 2011). In *Campbell*, the plaintiff never told anyone that she intended to make an external report and had not determined how she would do so. *Campbell v. G4S Secure Sols. (USA) Inc.*, 645 F. App'x 506, 510 (6th Cir. 2016). Xia, by contrast, expressly identified the agencies to which he intended to report and did so after repeatedly documenting and raising the suspected violations internally. Because *Shallal* does not require an employee to complete the contemplated report, Xia's failure to contact CBP or the IRS before his termination does not preclude a finding that he was "about to report." *Shallal*, 455 Mich. at 620–21.

2. <u>Causation</u>

The parties dispute whether Xia's protected activity caused his termination. (ECF No. 31, PageID.1013; ECF No. 33, PageID.1063). To establish causation under the WPA, Xia must show that Defendants took adverse action "because of" his protected activity. *West v. Gen. Motors Corp.*, 469 Mich. 177, 185; 665 N.W.2d 468 (2003). A temporal relationship alone is insufficient; the evidence must permit

an inference that the adverse action was "in some manner influenced by the protected activity." *Id.* at 185–86.

The record permits competing inferences on causation. Xia testified that Defendants' treatment of him changed after he raised his country-of-origin concerns. According to Xia, he was isolated from his team, the CFO stopped responding to him, and he was excluded from meetings. (ECF No. 28-2, PageID.351, Tr. 40:7–8; PageID.363 Tr. 52:20-53:1). Xia also testified that, after he raised the dumping issue, an HR employee told him, "something along the line that [he] was going to be fired." (*Id.* at PageID.365, Tr. 54:8–14). He later told management that he "would have to report to CBP or IRS" if Defendants did not address his concerns. (*Id.* at PageID.391, Tr. 80:14–81:1). Taken together, this evidence could permit a reasonable jury to infer that Xia's termination was influenced by his protected activity, rather than merely coincidental in time. *See West*, 469 Mich. at 186.

Defendants, however, maintain that Xia was terminated because of restructuring and poor performance. (ECF No. 30, PageID.940). Gao states in his affidavit that Xia was terminated as part of a "reorganization and downsizing," that Xia failed to prepare accurate and timely financial reports, and that his professional and managerial capabilities did not satisfy the requirements of his position. (ECF No. 30-1, PageID.948–49, ¶¶ 5–7). But Gao's deposition testimony reflects substantially less knowledge of Xia's performance than his affidavit suggests.

Gao previously testified that he had "no idea" whether Xia was a good or bad performer, that he never disciplined Xia, that he was never instructed to discipline Xia, and that he was never made aware of the details of any discipline issued to Xia. (ECF No. 28-13, PageID.701, Tr. 19:21–24; PageID.704, Tr. 22:23–25; PageID.705, Tr. 23:8–18). Zhu likewise testified that he never observed Xia's work performance, had no information concerning Xia's performance, and did not know why Xia was terminated. (ECF No. 28-14, PageID.800, Tr. 16:9–11; PageID.816, Tr. 32:9–17).

Those conflicts cannot be resolved on summary judgment. As discussed above, when a moving party's affidavit conflicts with its witness's deposition testimony, the sham-affidavit doctrine does not require exclusion of the affidavit; rather, the opposing party "receives the benefit of the conflict," and the contradiction itself may create a genuine issue of material fact. *Reed*, 735 F. App'x at 198. Resolving the conflict between Gao's affidavit and deposition testimony would require the Court to weigh the evidence and make credibility determinations, which are jury functions. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Viewing the record in each party's favor, a reasonable jury could (1) credit Gao's affidavit and find that Xia was terminated as part of a restructuring and because of performance concerns, or, on the other hand, (2) credit Xia's testimony that Defendants' treatment of him changed after he raised his concerns, that he was threatened with termination, and that Gao's contradictory deposition testimony

undermines Defendants' asserted performance rationale. A genuine issue of material fact therefore remains as to whether Xia's protected activity influenced his termination. *See West*, 469 Mich. at 185–86.

Defendants' position that they were unaware Xia had contacted an outside agency does not alter the Court's conclusion. (ECF No. 31, PageID.1013). Xia's theory is that Defendants terminated him because he was about to report, not because he had already done so. (ECF No. 28-2, PageID.391, Tr. 80:14–81:1). Thus, whether Defendants knew that Xia had contacted an outside agency does not resolve whether his stated intention to do so influenced the termination decision. Accordingly, neither party is entitled to summary judgment on Count I.

C. *Wrongful Discharge in Violation of Michigan Public Policy*

Defendants also seek summary judgment on Xia's claim for wrongful discharge in violation of public policy. (ECF No. 31, PageID.1013–15). Michigan generally permits an at-will employee to be terminated "at any time for any reason." *Stegall v. Resource Technology Corp.*, 514 Mich. 327, 340 (2024). But "some grounds for discharging an employee are so contrary to public policy as to be actionable." *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 695 (1982). Among those circumstances are when an employee is discharged for "performing an action that public policy would encourage" or "refusing to perform an action that

public policy would condemn." *Janetsky v. Cnty. of Saginaw,* No. 166477, 2025 WL 2095369, at *6 (Mich. July 25, 2025).

Xia's claim falls within this recognized theory of wrongful discharge. He alleges that Defendants terminated him because he refused to participate in conduct he believed violated federal tax and tariff laws and instead attempted to prevent or remedy that conduct. (ECF No. 1, PageID.9–10). When a public-policy claim is premised on an employee's efforts to prevent or remedy a violation of law, the plaintiff must show "(1) that the law was or would have been violated, (2) that [he] reasonably and in good faith believed [he was] remedying or preventing a violation of law, and (3) that [his] actions regarding the alleged violation were the basis for an adverse employment action." *Janetsky*, 2025 WL 2095369, at *8.

Defendants argue that Xia cannot satisfy the first element because he has produced no evidence that the conduct he opposed violated any law, rule, or regulation. (ECF No. 31, PageID.1013–15). Relying on *Piasecki v. City of Hamtramck*, 249 Mich. App. 37; 640 N.W.2d 885 (2001), and *Giordano v. Williams International Co., LLC*, No. 342386, 2019 WL 1867133 (Mich. Ct. App. Apr. 25, 2019), Defendants contend that Xia's subjective belief that their practices were unlawful is insufficient.

In both cases, the plaintiff's public-policy claim failed because the law invoked by the plaintiff did not prohibit the conduct at issue. In *Piasecki*, the

plaintiff alleged that she was discharged for refusing to disclose tax information that she believed was protected by a city ordinance. 249 Mich. App. at 38–39. But the requested disclosure fell within an exception to the ordinance, meaning that the plaintiff "would not have committed a crime had she divulged the information." *Id.* at 43. Similarly, in *Giordano*, the plaintiff alleged that he was discharged for refusing to perform work that he believed violated FAA regulations. 2019 WL 1867133, at *1. The unrebutted evidence, however, established that the regulations did not apply to the work he was asked to perform. *Id.* at *3–4. Although the plaintiff "did not have to prove that he or defendant in fact violated the FAA regulations," he was required to establish that the "regulations prohibited the conduct he refused to perform." *Id.* at *4.

Unlike *Piasecki* and *Giordano*, the record here contains evidence from which a reasonable jury could find that the law prohibited the conduct Xia opposed. Xia testified that Defendants manipulated reported costs and country-of-origin designations to unlawfully reduce their tax and tariff obligations. (ECF No. 28-2, PageID.348, Tr. 37:8–38:2). He also identified tax evasion as one of the violations implicated by the alleged conduct and provided management with the IRS Tax Crimes Handbook. (ECF No. 28-4, PageID.453). That handbook identifies 26 U.S.C. § 7201, which prohibits a willful attempt "in any manner to evade or defeat any tax" or its payment. (*Id.* at PageID.478). This evidence creates a genuine dispute

as to whether the law "was or would have been violated." *Janetsky*, 2025 WL 2095369, at *8.

Defendants' reliance on a March 2025 CBP Notice of Action does not eliminate that factual dispute. The notice verifies that a particular product imported in May 2024 qualified as an originating good under the USMCA. (ECF No. 30-3, PageID.961). But it concerns a specific product imported several months after Xia's termination and does not establish that the pricing and country-of-origin practices Xia challenged in 2023 complied with applicable law.

The second element requires Xia to show that he reasonably and in good faith believed he was attempting to prevent or remedy a violation of law. *Janetsky*, 2025 WL 2095369, at *8. Xia identified the conduct he believed was improper and connected it to potential tax violations, warning management that "any willful attempt to evade or defeat taxes is considered a felony" and providing the IRS Tax Crimes Handbook in support of his concerns. (ECF No. 28-4, PageID.453). He also testified that he "did not want to get involved in such fraudulent practices" and therefore raised his concerns with senior management. (ECF No. 28-2, PageID.350, Tr. 39:25–40:2). This evidence permits a reasonable jury to find that Xia reasonably and in good faith believed he was attempting to prevent or remedy a violation of law.

The third element requires Xia to show that his "actions regarding the alleged violation were the basis for an adverse employment action." *Janetsky*, 2025 WL

2095369, at *8. For substantially the same reasons discussed above in addressing causation under Xia's WPA claim, a genuine dispute exists on this element.

Xia testified that Defendants' treatment of him changed after he raised his concerns and that an HR employee told him he was going to be fired after he raised the dumping issue. (ECF No. 28-2, PageID.351, Tr. 40:2-13; PageID.363, Tr. 52:20–53:1; PageID.365, Tr. 54:8–14). Defendants, by contrast, maintain that Xia was terminated because of restructuring and poor performance. (ECF No. 30, PageID.940; ECF No. 30-1, PageID.948-49, ¶¶ 5-7). As discussed above, however, Gao's deposition testimony conflicts with the performance-based explanation in his affidavit. (ECF No. 28-13, PageID.700, Tr. 18:24–19:24; PageID.704, Tr. 22:23–23:11; PageID.705, Tr. 25:14–26:11).

Resolving these competing accounts would require the Court to weigh the evidence and assess credibility. A genuine dispute therefore remains as to whether Xia's actions concerning the alleged violations were a basis for his termination. *See Janetsky*, 2025 WL 2095369, at *8. Accordingly, Defendants are not entitled to summary judgment on Xia's wrongful-discharge claim.

D. *The Defend Trade Secrets Act Counterclaim*

The parties also cross-move for summary judgment on Defendants' counterclaim under the Defend Trade Secrets Act ("DTSA"). To establish a DTSA claim, Defendants must show "(1) the existence of a trade secret," (2) its relation to

a product or service used or intended for use in interstate or foreign commerce, and (3) its misappropriation. *In re Island Indus., Inc.*, 2024 WL 869858, at *2 (6th Cir. Feb. 29, 2024). A trade secret must derive independent economic value from not being generally known or readily ascertainable and must be subject to reasonable measures to maintain its secrecy. 18 U.S.C. § 1839(3). "Merely asserting that items are 'trade secrets' does not make them so." *Broad-Ocean Techs., LLC v. Lei*, 649 F. Supp. 3d 584, 593 (E.D. Mich. 2023).

As part of the first element, Defendants must identify the information for which they seek protection with "sufficient definiteness" to permit the Court to determine whether the information qualifies for protection and whether it was appropriated. *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 380 (6th Cir. 2022). Thus, a claimant cannot "effectively assert[] that all information in or about" a product constitutes a trade secret because such a claim is "both too vague and too inclusive," and does not allow a jury to "separate the trade secrets from the other information that goes into any" product in the field. *Id.* at 381 (citation omitted). Rather, the claimant must identify secrets at a level of specificity beyond broad categories of information. *Id.*

Defendants have not made that showing. They characterize the information Xia retained generally as "computer files" and "sensitive and confidential company files." (ECF No. 30, PageID.940–41). Xia testified that the drive contained his daily

work files, including emails, spreadsheets, documents, and monthly financial records. (ECF No. 28-2, PageID.388, Tr. 77:4–79:14). But neither that testimony nor Defendants' evidence identifies which information within those broad categories constitutes the trade secret for which Defendants seek protection. *See Caudill Seed*, 53 F.4th at 380–81.

Gao's affidavit does not fill that gap. Gao states that Defendants issued Xia a password-protected laptop and gave him access to "email programs, password-protected files, and other confidential company information and documents." (ECF No. 30-1, PageID.949, ¶¶ 9–10). Password protection may bear on whether Defendants took reasonable measures to maintain secrecy. *See MLive Media Grp. v. Webber*, No. 14-cv-13148, 2014 WL 4472602, at *4 (E.D. Mich. Sept. 10, 2014). But it does not identify the information claimed as a trade secret or establish that the information derived independent economic value from remaining secret.

Gao's deposition testimony further illustrates the deficiency. He testified that he had no personal knowledge of any trade-secret information on Xia's laptop. (ECF No. 28-13, PageID.713, Tr. 31:5–7). He likewise could not identify the particular document or information allegedly missing from the drive. (*Id.* at PageID.724, Tr. 42:3–25; PageID.727, Tr.45:10–25). And although Gao testified that missing documents caused difficulties with an investment project, when asked what

document was needed, he responded, "I don't know." (*Id.* at PageID.729, Tr. 47:16–24).

As discussed above, the Court does not consider the ArcherHall report or Finch affidavit in resolving the parties' motions. (ECF No. 30-4; ECF No. 30-5, ECF No. 30-6). Even if the Court considered that evidence, however, it would not cure Defendants' failure to identify the alleged trade secrets with sufficient specificity. According to Defendants, ArcherHall identified 5,249 files on the device, more than 700 files that were accessed or downloaded between Xia's termination and the return of the laptop, and more than 660 files that were transferred to the Recycle Bin. (ECF No. 30, PageID.930). Finch's supporting affidavit similarly explains that the ArcherHall report catalogs deleted files, internet history, Recycle Bin activity, computer activity, and connected external devices. (ECF No. 30-4, PageID.963, ¶¶ 6–11). That evidence describes the files and activity concerning them, but it does not identify the particular information Defendants claim as a trade secret or establish how that information derives independent economic value from not being generally known. Identifying files allegedly retained, accessed, or deleted does not, without more, identify the trade secrets allegedly contained within those files. *See Caudill Seed*, 53 F.4th at 380–81.

*Broad-Ocean Technologies* illustrates this distinction. 649 F. Supp. 3d. at 592–93. There, the court explained that a claimant cannot simply identify hundreds of

documents purportedly containing trade secrets but must identify the "concrete secrets" reflected in those documents. *Id.* (citation omitted). The claim nevertheless survived because the plaintiff went further, identifying specific design files, explaining that nearly all were CAD files relating to its fuel-cell systems, describing the proprietary technology reflected in them, and presenting evidence concerning its investment in and the competitive value of that technology. *Id.* at 593–95. Defendants offer no comparable level of detail here.

Accordingly, even considering the ArcherHall evidence and viewing the record in Defendants' favor, the evidence establishes at most that Xia retained numerous company files, some of which contained confidential information. It does not identify the information or combination of information Defendants claim as a trade secret with sufficient definiteness for a jury to determine whether it satisfies § 1839(3). Because Defendants cannot establish the threshold existence of a trade secret, the Court need not determine whether Xia's retention of the drive constituted misappropriation. The Court therefore grants Xia's motion for summary judgment and denies Defendants' cross-motion as to the DTSA counterclaim.

E. *The Computer Fraud and Abuse Act Counterclaim*

The parties also cross-move for summary judgment on Defendants' counterclaim under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq*. Defendants allege that Xia accessed their computers and information

without authorization or in excess of his authorization, both before and after his employment ended. (ECF No. 1, PageID.27–28, ¶¶ 32–40).

The CFAA imposes liability on a person who, among other things, "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer." 18 U.S.C. § 1030(a)(2)(C). The Act defines "exceeds authorized access" as accessing a computer with authorization and using that access "to obtain or alter information in the computer that the accessor is not entitled to obtain or alter." *Id.* § 1030(e)(6).

The Supreme Court has explained that the CFAA employs a "gates-up-or-down inquiry." *Van Buren v. United States*, 593 U.S. 374, 390 (2021). A person "exceeds authorized access" when he has permission to access a computer but obtains information from an area of the computer, such as a file, folder, or database, that is "off limits to him." *Id.* at 396. Thus, the CFAA does not prohibit a person from obtaining information that he is authorized to access merely because he does so for an improper purpose. *Id.* at 389–90. Consistent with that interpretation, the Sixth Circuit has held that employees who were authorized to access company information did not violate the CFAA by subsequently misusing that information. *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 760–61 (6th Cir. 2020).

To the extent Defendants' claim rests on Xia's conduct during his employment, it fails as a matter of law. Defendants provided Xia the laptop to perform his accounting and financial-reporting responsibilities and granted him access to company email, password-protected files, and other confidential company information. (ECF No. 30-1, PageID.949, ¶¶ 8–10). Indeed, Defendants themselves acknowledge that Xia was granted such access. (ECF No. 31, PageID.1002). Defendants identify no file, folder, program, or other information that Xia accessed while employed but was not entitled to access. His alleged improper purpose in retaining company information therefore cannot convert otherwise authorized access into a CFAA violation. *See Van Buren*, 593 U.S. at 389–90; *Royal Truck*, 974 F.3d at 760–61.

Defendants' post-termination theory fares no better. Xia admitted that, after his termination and before returning the laptop, he opened the laptop, removed its memory device, replaced it with a new one, and retained the original device because he believed it contained evidence relevant to contemplated litigation. (ECF No. 28-2, PageID.387, Tr. 76:13-77:3). Defendants emphasize those admissions in support of their counterclaims. (ECF No. 31, PageID.1005–06). But the CFAA does not impose liability merely because an employee improperly retains or uses information that he previously accessed with authorization. *See Royal Truck*, 974 F.3d at 762–63. Xia's physical removal and retention of the memory device therefore do not,

without evidence that he accessed the computer or information without authorization, establish a violation of the CFAA.

The admissible record does not supply the needed evidence. Xia's testimony establishes that he physically removed and retained the memory device, but Defendants point to no admissible evidence establishing that Xia accessed any file, program, server, or other computer information after his authorization ended. Instead, Defendants rely on the inadmissible ArcherHall report for their assertion that Xia accessed or downloaded files after his termination. (ECF No. 31, PageID.1006–07). Without that evidence, Xia's admitted removal of the memory device does not establish the unauthorized computer access required by § 1030(a)(2)(C).

Defendants' reliance on *People v. Walker*, No. 304593, 2011 WL 6786935 (Mich. Ct. App. Dec. 27, 2011), does not alter that conclusion. *Walker* interpreted Michigan's computer-crime statute, Mich. Comp. Laws § 752.795, rather than the CFAA. Yet Defendants rely on *Walker* for the elements of their federal CFAA claim and then conclude that Xia violated the CFAA because he completed the alleged post-termination downloads. (ECF No. 31, PageID.1017–18). Because the claim arises under § 1030, the Court applies the federal statute as interpreted by the Supreme Court and Sixth Circuit, not the elements of Michigan's separate computer-crime statute.

Accordingly, Defendants have not produced evidence from which a reasonable jury could find that Xia intentionally accessed a protected computer without authorization or exceeded authorized access within the meaning of the CFAA. Xia is therefore entitled to summary judgment on Defendants' CFAA counterclaim, and Defendants' cross-motion for summary judgment on that claim is denied.

F. *The Spoliation Counterclaim*

Finally, Xia seeks summary judgment on Defendants' spoliation counterclaim. (ECF No. 28, PageID.325–26). Defendants allege that Xia knew litigation was pending or probable, possessed electronic evidence relevant to that litigation, and "willfully destroyed" that evidence, causing Defendants monetary damages. (ECF No. 1, PageID.28–29, ¶¶ 42–47).

Michigan, however, does not recognize an independent cause of action for spoliation of evidence. *Teel v. Meredith*, 284 Mich. App. 660, 663–64 (2009). In *Teel*, the Michigan Court of Appeals declined to recognize spoliation as an independent tort, explaining that the creation of such a cause of action should be left to the Legislature. *Id.* The Sixth Circuit has likewise recognized that, under Michigan law, "the tort of spoliation is . . . not available." *Adkins v. Wolever*, 520 F.3d 585, 590 (6th Cir. 2008), vacated on other grounds for reh'g en banc, 554 F.3d 650 (6th Cir. 2009).

Because Michigan law does not recognize it as an independent cause of action, Xia is entitled to summary judgment on Defendants' spoliation counterclaim. Accordingly,

IT IS ORDERED that Xia's motion for summary judgment (ECF No. 28) is granted in part and denied in part.

IT IS FURTHER ORDERED that Xia's motion for summary judgment is granted as to Defendants' Counterclaims.

IT IS FURTHER ORDERED that Xia's motion for summary judgment is denied as to Count I of Xia's Complaint.

IT IS FURTHER ORDERED that Defendants' amended cross-motion for summary judgment (ECF No. 31) is denied in its entirety.

Dated: September 25, 2026

s/Robert J. White
Robert J. White
United States District Judge